JODI LINKER
Federal Public Defender
Northern District of California
JOHN PAUL REICHMUTH
Assistant Federal Public Defender
1301 Clay Street, Ste. 1350N
Oakland, CA 94612
Telephone:  (510) 637-3500
Facsimile:   (510) 637-3507
Email:        john_reichmuth@fd.org

Counsel for Defendant Thompson

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>NAJEE THOMPSON,<br><br>  Defendant. | Case No.: 23–CR–199 YGR<br><br>**SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**<br><br>**Court:**           Courtroom 1, 4th Floor<br>**Hearing Date:**  November 6, 2025<br>**Hearing Time:**  9:00 a.m. |

## INTRODUCTION

Najee Thompson comes before the Court to be sentenced for violation of 18 U.S.C. § 922(a)(1)(A), dealing firearms without a license, and requests a sentence of 48 months imprisonment followed by three years of supervised release. That would be sufficient, but not greater than necessary, to comply with the sentencing goals set forth in 18 U.S.C. § 3553: Mr. Thompson's childhood trauma and substance use disorder are well-documented and uncommonly tragic. Addressing Mr. Thompson's behavior must be rooted in an acknowledgement that he needs trauma-informed wraparound programming. A sentence of four years in federal prison, and particularly the support that he can receive while on Supervised Release would be more than sufficient to help him live a prosocial life as a working parent. The parties and the Probation Officer agree on the guidelines in this case, a Total Offense Level of 27 and a Criminal History Category III, yielding an advisory sentencing range of 87 to 108 months imprisonment. The statutory maximum is 60 months of imprisonment and the Probation Officer recommends a downward variance to a sentence of 48 months imprisonment.

## SENTENCING RECOMMENDATION

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996) (quotations omitted)). Ultimately, the "overarching statutory charge for a district court is to 'impose a sentence sufficient but not greater than necessary'" to reflect the factors detailed in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)). The § 3553(a) factors assist the Court in fulfilling its mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).

Against this backdrop, the Court must identify the *least amount of time necessary* to satisfy the objectives outlined in 18 U.S.C. § 3553(a). To be clear, every day of prison must be necessary under

federal law. A substantively reasonable sentence, accordingly, will balance the need for deterrence and punishment against the circumstances that shaped Mr. Thompson's life. He does not suggest that his life experiences in any way excuse his actions, but they do provide an appropriate framework within which the Court may determine what sentence is sufficient, but not greater than that necessary, to meet § 3553(a)'s criteria. A four-year prison sentence, as recommended by the Probation Office, is appropriate and practical.

### I. Mr. Thompson's childhood was corroded by abuse and neglect but he has made strong efforts to be a truck-driving and law-abiding parent

At age 13, according to a report filed in the juvenile court, Mr. Thompson was "delivered into protective custody by the Emergency Response Child Welfare Worker." Ex. A, *Detention Report, in the Matter of Najee Thompson*, Bates-9 (under seal).[1] The report noted that:

> the Hayward Police Department responded to a call for suspected child abuse at the Thompson home in Hayward. The police spoke with the mother, [REDACTED], and the minor, Najee Thompson. The officer observed two minor welts on the inside of Najee's right forearm. Najee told the officer that he got the welts from his mother hitting him with a belt. Officer T. Decosta determined that it was necessary and appropriate to remove Najee from the care of his mother for physical abuse. *Id.* at 10.

The details of the incident establish years of physical abuse:

> Najee said his mother "kept hitting me on my arms, fifteen solid hits" with the belt . . . . Najee said that his mother hits me "once every two days, the other days she just be yellin." Najee said that his.mother hits him mostly with her hand, but when she is really angry she hits him with the belt.
> ….
> Najee said that his mother has hit him and yelled at him since he was about nine years old. Najee said that his mother got hurt at work and ever since then things have been difficult for the family. *Id.* at 11-12.

Another petition also documented physical abuse but noted neglect, as well. It stated: "on or about 08/11/07, the Hayward Police Department removed the minor from the mother's home because she hit the minor's face with a cane on 08/10/07, the minor is afraid of further physical abuse, the mother refuses to provide care for the minor."  Ex. B. *Supplemental Petition for More Restrictive Placement (Attachment)*. (under seal).

Not surprisingly, physical abuse and neglect were accompanied by verbal and psychological

---

[1] The exhibits will be submitted under seal with a proposed order. Juvenile records must be filed under seal.

SENTENCING MEMORANDUM
*THOMPSON*, 23–CR–199 YGR

2

abuse:

> Najee said that his mother says things like "didn't I tell you to do this" and "didn't I tell you to do that. Najee said that his mother "calls me names like mother****er, b***h, stuff like that [and] dumb*ss." Najee said that his mother yells at him every day at least two times per day. Ex. A. at 11-12.

This incident also established a toxic form of abuse, lack of affection, "that he does not feel that his mother shows that she loves him at all." *Id.* at 12.

One juvenile probation officer summarized the case:

> Najee was removed from his mother's home in 2007, as a result of allegations the minor's mother had struck him with belts, yelled at him, and inflicted emotional abuse. Najee was initially placed in a foster home, and also with his maternal grandmother. Ms. Copeland indicated the minor's mother was "very difficult to deal with" and did not cooperate with social services. On one occasion, when asked for clothing for Najee, the minor's mother filled a box with Najee's clothing and threw the box outside for social services staff to collect. Najee's mother has a history of possible psychiatric hospitalizations. Although alleged, social services was never able to confirm Ms. Thompson's true mental health diagnosis. It is unclear where the minor's mother is currently living. Ex. C, *Probation Officer's Supplemental Report*, (Under Seal) 803.

Mr. Thompson's abuse at the hands of his mother was corroborated by his grandmother, his next custodian after a foster home, who noted the fear that Mr. Thompson had of returning home. In a *Memorandum to the Court*, when Mr. Thompson was 14:

> According to the grandmother, the mother would hit the minor when he was younger and as he got older the minor would leave home when the mother hit him; making it more difficult for the mother to control him. According to the grandmother, the mother has a "mental sickness", possibly schizophrenia and she smokes marijuana. The mother is always accusing Najee of trying to hurt her. The mother refuses to financially help the grandmother in providing for the minor. The minor has told her he would "rather die before returning to his mother's home." Memorandum to the Court, *In the Matter of Najee Thompson*, Ex. D (Under Seal) at Bates-243.

Mr. Thompson's abuse was significant and corroborated.

Even though he had been removed from this abuse, residing with his grandmother nevertheless resulted in a life of chaos for this junior-high-aged young man. There was still no money, no school, and no stability:

> The grandmother and minor have reported they have little money for transportation, food, and general living expenses. Not. only Najee, but the entire family needs intervention services to stabilize as they face a host of dilemmas. The minor has been out of school for approximately two

SENTENCING MEMORANDUM
*THOMPSON*, 23–CR–199 YGR

3

months. *Id.* at Bates-244.

The situation guaranteed a poor outcome for Mr. Thompson: he had little chance to develop into a functioning adult.

Mr. Thompson was soon unsupervised and unhoused while still a minor. At age 16, a Juvenile Probation Officer noted: "Prior to his arrest for the present offense, the minor was 'on the streets.' He slept in bathrooms or local parks." Ex E, *County of Santa Clara Probation Department Probation Officer's Report*, (under seal) 748. Summarizing, the Officer stated, "The minor has experienced a tumultuous childhood during which he was subjected to physical abuse, unstable living situations, and inconsistent parental involvement." *Id.* at 752. Another Officer concluded: "his delinquency appears to be directly attributed to a lack of parental supervision and the instability of his family dynamics." Ex. C at 805.

Mr. Thompson's father also lived with many challenges and had been unable to be a father until he completed parole successfully.

> Mr. [REDACTED] was discharged from parole in 2009. He most recently served a three (3) year prison commitment as a result of a 2004 Possession of Cocaine Base for Sale conviction (CDC#V36120). He indicated he violated his parole in 2009 for driving without a license and was returned to prison. He reported he successfully completed parole in April 2010. Ex. C 803.

At 17, Mr. Thompson moved in with his father, but this eventually collapsed as well:

> The minor reported when his father lost their housing in San Jose, California, they lived with relatives, friends, in homeless shelters, and eventually separated. He was unable to secure a stable residence and had no method of transportation so he stopped attending school. At the time of his arrest, he was living with his father's transient girlfriend who had secured a hotel room." Ex. C 802.

The Officer elaborated:

> His father's whereabouts is currently unknown. He has not appeared for court hearings and has reportedly not cooperated with office visits scheduled by Social Services. He has expressed a desire to care for Najee; however, admitted, realistically it is not possible at this time. Ex. C 803.

Najee Thompson had no chance at life, given the dysfunction and chaos he inherited from both of his parents.

Along with inhumane upbringing came substance use disorder. The Presentence Report notes early use of marijuana (11), cocaine (14), methamphetamine (14) and opiates (14). PSR ¶ 63.

SENTENCING MEMORANDUM
*THOMPSON*, 23–CR–199 YGR

4

Cocaine dependency was a major factor in his life and led to the commission of the instant offense. PSR ¶ 64.

Mr. Thompson, for all the damage that was inflicted on him in his youth, has powerful motivation to succeed upon release. He obtained a Class A trucking license during the pendency of this case. PSR ¶ 66. He has several years of recent employment with short interruptions and good wages. PSR ¶ 67-70. Mr. Thompson also has children aged 4, 9, 10, and 13. He wants to come home from prison and be a father to them, while pursuing truck driving:

> [I] want to continue to be in my kids' lives and help them stay in school and keep them busy in positive activities while I'm gone. I'm helping my family with ways to keep my kids busy, with sports and other activities, so the time goes by and their mind doesn't wander in negative ways. PSR ¶ 58.

Mr. Thompson has made mistakes, mostly due to childhood trauma and substance use disorder, but he has made honest strides to make something out of himself and work, parent, and become a licensed trucker.

## II.   Argument

### A.   Mr. Thompson did not commit the Offense described in paragraphs 5, 38, 46 of the Presentence Report

Paragraphs 5 and 46 contain inflammatory allegations that have not been proven and that Mr. Thompson denies. Further, the description of the charges contains irrelevant and prejudicial allegations which should not be in the PSR. The statement of facts in PSR ¶ 64, for example, says nothing about kidnapping or forcible sodomy, yet both paragraphs use that language. Thus, this paragraph would serve only to make people think that Mr. Thompson committed those offenses, when even the factual allegations do not support them. These paragraphs should be stricken.

As noted in the objection to PSR ¶ 38, which the PSR notes to be unresolved, Mr. Thompson did not commit the acts in that section, and it should either be removed or substantially reduced to include only those facts he admitted, with Mr. Thompson's objection noted. Mr. Thompson resolved a Life case for a three-year sentence with half-time credit due to the incredibility of the complaining witness's account. He did not have sex with that complaining witness or any other minor.

B.  **Childhood trauma and substance use mitigate the acts in this case, lessen the need for prison, and spawn the key mitigating fact of this case: Mr. Thompson's treatability.**

    1.    **A brutish childhood**

A syndrome of trauma and substance use has dominated Mr. Thompson's life since childhood. The childhood trauma in this case does not need to be repeated. It is beyond quantification, but the concept of Adverse Childhood Experiences or "ACEs" provides a helpful lens through which to view it. It is now widely accepted that living through one or more of these ACEs has profound ripple effects on an individual as an adult. These effects extend to physical brain development.

The 10 ACE's are: (1) emotional abuse; (2) physical abuse; (3) sexual abuse; (4) mother treated violently; (5) substance abuse in the household; (6) mental illness in the household; (7) parental separation or divorce; (8) incarcerated household member; (9) emotional neglect; and (10) physical neglect. In one study, someone who faced four ACEs was "460 percent more likely to suffer from depression than someone with an ACE score of 0" and "an ACE score greater than or equal to 6 shortened an individual's lifespan by almost 20 years."[2]

Mr. Thompson's ACE's score would be a 9, as he was not sexually assaulted.[3] This ACE score shows not only a reduced culpability, but it also means that any prison sentence will be more severe for Mr. Thompson.

It is often repeated by courts, prosecutors and others that childhood trauma is not an excuse for an adult's behavior. Some courts have dismissed years of neglect and abuse inflicted upon a defendant as a child, arguing that a grown man has had plenty of time to decide what type of adult he should be. But childhood trauma does not have an expiration date. Indeed, trauma is a major factor "that shapes . . . criminal behavior in adulthood." Burch, Audra, *A Gun to His Head as a Child. In Prison as an Adult.*, NEW YORK TIMES (October 15, 2017). One commentator explains,

> [I]n a justice system built upon the idea of choice and personal responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a prison cell, or whether they are even wired to make rational decisions.

---

[2] Felitti VJ. The Relation Between Adverse Childhood Experiences and Adult Health: Turning Gold into Lead. Perm J. 2002 Winter;6(1):44-47. doi: 10.7812/TPP/02.994. PMID: 30313011; PMCID: PMC6220625.

[3] Mr. Thompson's mother has obtained a restraining order against a partner.

SENTENCING MEMORANDUM
*THOMPSON*, 23–CR–199 YGR

*Id*. It is a "huge factor within the criminal justice system." *Id*. Childhood trauma shapes one's adulthood and continues to impact a person every day of his life. It was completely beyond Mr. Thompson's control and made him grow up with major deficits in emotional regulation and life skills.

The likely impact of that incredibly traumatic background cannot be overstated, and the Court should take that into serious consideration when determining an appropriate sentence by granting a variance.

### 2. A chronic and debilitating, but treatable, addiction

This trauma is in turn the reason why Mr. Thompson has been enveloped by major cocaine substance use disorder. Statistically, because of childhood trauma, his involvement in this crisis was virtually guaranteed:

> For example, a male child with an ACE score of 6 has a 4600% increase in the likelihood of later using intravenous drugs. This relation to adverse childhood experiences is powerful and is graded at every step; it provides a perfect dose-response curve; and epidemiologically, these outcomes are nearly unique in magnitude. Because no one shoots heroin to get endocarditis or AIDS, might heroin then be used for relief of profound anguish dating back to childhood experiences? Might it be the best coping device a person can find? If so, is this phenomenon a public health problem or a personal solution? How often are public health problems personal solutions? Is drug abuse self-destructive, or is it a desperate attempt at self-healing, albeit at a significant future risk? This point is important because primary prevention is far more difficult than anticipated—possibly because incomplete understanding of the benefits of so-called health risk behaviors causes these behaviors to be viewed as irrational acts that have only negative consequences. Does this incomplete view of drug abuse leave us mouthing cautionary platitudes instead of understanding the cause of our intractable public health problems?[4]

In turn, the offenses in this case were completely intertwined with Mr. Thompson's cocaine dependency. Mr. Thompson's crime was driven to make money because cocaine prevented him from working a stable, law-abiding job and also provided a significant financial need at the same time: "it contributed because I wasn't working because I was high. I wanted to keep getting high and my offense is what funded my ability to keep buying drugs." PSR ¶ 64.

The District Court for the Eastern District of Wisconsin summarized this connection between

---

[4] Felitti VJ. The Relation Between Adverse Childhood Experiences and Adult Health: Turning Gold into Lead. Perm J. 2002 Winter;6(1):44-47. doi: 10.7812/TPP/02.994. PMID: 30313011; PMCID: PMC6220625.

SENTENCING MEMORANDUM
*THOMPSON*, 23–CR–199 YGR

7

addiction and culpability:

> [A]ddiction can mitigate a defendant's culpability. "By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences." *United States v. Dikiara*, 50 F. Supp. 3d 1029, 1032–33 and n.1 (E.D. Wis. 2014) (quoting *United States v. Hendrickson,* No. CR 13–4110, 2014 WL 2600090, at *5 (N.D.Iowa June 11, 2014)).

Mr. Thompson was dealing with this "hijacking" of his brain from the age of 11.

The National Institute on Drug Abuse describes substance use disorder as "a chronic, relapsing disorder characterized by compulsive drug seeking and use despite adverse consequences. It is considered a brain disorder, because it involves functional changes to brain circuits involved in reward, stress, and self-control. Those changes may last a long time after a person has stopped taking drugs."[5] Prolonged drug abuse physically alters the parts of the brain that "are critical to judgment, decision-making, learning and memory, and behavior control."[6] Once we accept that a person addicted to drugs has a physically altered brain, it is easier to appreciate that the behavior they exhibit is not completely voluntary. They are literally fighting biology.

And, as the sentencing court in *United States v. Hicks,* 985 F. Supp. 2d 1307, 1310–11 (M.D. Ala. 2013) noted, the sentencing factors of protection of the public, as well as deterrence of the individual, are strongly implicated by addiction:

> In such circumstances, intensive treatment is more likely than lengthy incarceration to protect the public from future offenses by the afflicted individual. "[A]ddiction propels ... criminal behavior." Charles J. Hynes, *Better Than Prison A Prosecutor's Collaborative Models for Reducing Criminal Recidivism,* Hum. Rts., Spring 2009, at 16 . . . . However, "while traditional parole/probation has failed to decrease recidivism in addicted offenders, placing such offenders in drug and alcohol treatment programs does decrease recidivism." *Id.* at 139; *see also United States v. Bannister,* 786 F.Supp.2d 617, 658 (E.D.N.Y.2011) ("Except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and the length of imprisonment."). This, of course, makes sense: where crime is fueled by

---

[5] NIDA. 2024, January 5. Drug Misuse and Addiction. Retrieved from https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/drug-misuse-addiction on 2024, April 26

[6] NIDA. 2024, January 5. Drug Misuse and Addiction. Retrieved from https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/drug-misuse-addiction on 2024, April 26

addiction, the addiction "sticks deeper, grows with more pernicious root" than the crime itself. William Shakespeare, *The Tragedy of Macbeth,* Act VI, Sc. 3. Therefore, treating the addiction is a more effective way to halt the criminal activity than harshly punishing the crime without regard to its broader context. *Hicks*, 985 F. Supp. 2d at 1310–11.

There is an extensive history of drug dependency in this case. Mr. Thompson began marijuana use at approximately 11 years of age and had sampled hard drugs at 14. This is child abuse and neglect on its face. And he cannot be blamed for childhood drug abuse. He was a victim of it. This fact, coupled with the relative lack of treatment history, reduces culpability and provides strong opportunities for treatment as deterrence and incapacitation. Substance dependency justifies the sentence requested by the Probation Office and the defense.

## CONCLUSION

Based on the foregoing, Mr. Thompson respectfully requests that he be sentenced to 48 months imprisonment followed by three years of supervised release.

Dated:   October 30, 2025              Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

              /S
JOHN PAUL REICHMUTH
Assistant Federal Public Defender

SENTENCING MEMORANDUM
*THOMPSON*, 23–CR–199 YGR

9